No. 115,614

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In re TERRA L. MCDANIEL.

SYLLABUS BY THE COURT

1.

While the timely filing of a notice of appeal is jurisdictional based on the statutory deadline, most of the subsequent steps in prosecuting an appeal are generally provided by appellate rule and are enforceable as this court deems appropriate in its discretion.

2.

An appellate court applies a dual standard of review from a finding of contempt by the district court. The court exercises unlimited review over the question of whether conduct is contemptuous and applies an abuse of discretion standard when reviewing the sanctions imposed.

3.

There are two classes of contempt:  direct contempt and indirect contempt. Conduct is classified as direct contempt when the underlying contemptuous acts are committed in open court in the presence of the judge. The accused is entitled to fewer statutory and constitutional procedural safeguards in direct contempt proceedings because the court has personal knowledge of the misconduct.

4.

In cases of direct contempt, the district court may impose summary punishment without written accusation as long as the court enters a written judgment that specifies the conduct constituting direct contempt, identifies the statement of the defense offered by the accused, and designates the sentence imposed.

1

5.

If the judge needs to rely on statements and testimony from others regarding what they know about the contemptuous acts, the misconduct constitutes indirect contempt. The accused is entitled to greater constitutional procedural safeguards in proceedings for indirect contempt because the judge has no personal knowledge of the misconduct. Kansas provides a detailed statutory procedure that must be followed in cases of indirect contempt.

6.

In addition to the statutory classifications of direct contempt and indirect contempt, Kansas courts make a distinction between contemptuous conduct that is civil in nature and that which is criminal in nature. Conduct giving rise to sanctions for criminal contempt is directed against the dignity and authority of a court or a judge acting judicially; the essence of criminal contempt is that the conduct obstructs or tends to obstruct the administration of justice. Criminal contempt punishes a party for a past violation of an order with a fixed fine or jail sentence as a punitive sanction.

7.

Civil contempt is a remedial or corrective action meant to coerce a party into abiding by the terms of a court order going forward. Upon a finding of civil contempt, a court may jail a particularly recalcitrant party for an indefinite period until he or she agrees to comply with the order. The party in civil contempt must be permitted to "unlock the door of the jail" by doing what the party previously failed to do.

8.

The failure of a prospective juror to appear for jury duty is governed by K.S.A. 43-165, which states that each judicial district may make rules governing jury service and enforcement, but unexcused, nonattendance of a person summoned unless reasonable cause for such nonattendance be shown to the satisfaction of the court shall be punished

by the imposition of a fine not exceeding $100 for each day of unexcused absence. As a matter of public policy, then, the legislature has provided a punitive statutory alternative to criminal contempt proceedings when a person is summoned for jury duty and the court ultimately finds that a failure to appear was without reasonable cause.

9.

Pursuant to K.S.A. 20-1203, a direct contempt may be punished summarily, without written accusation against the person arraigned, but if the court or judge in chambers shall adjudge him or her guilty thereof a judgment shall be entered of record, in which shall be specified the conduct constituting such contempt, with a statement of whatever defense or extenuation the accused offered thereto, and the sentence of the court thereon. Because failure to comply with this statute is jurisdictional, direct contempt orders that do not meet the requirement set forth in the statute are void.

Appeal from Sedgwick District Court; CHRISTOPHER M. MAGANA, judge. Opinion filed June 9, 2017. Reversed and remanded with directions.

*Jess W. Hoeme*, of Joseph, Hollander & Craft LLC, of Wichita, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., STANDRIDGE and GARDNER, JJ.

STANDRIDGE, J.: Terra L. McDaniel appeals her conviction for direct criminal contempt, arguing that appearing late for her second day of jury duty is insufficient to support a conviction for direct criminal contempt of court under the facts presented. The State claims we lack jurisdiction to hear this appeal and, even if we had jurisdiction, the district court did not err in finding McDaniel guilty of direct criminal contempt. For the reasons stated below, we reverse McDaniel's conviction.

3

McDaniel was summoned for jury duty with instructions to appear on Monday, December 7, 2015. She timely appeared and reported to the jury clerk on that day. The jury clerk assigned a panel of over 30 jurors, including McDaniel, to District Judge Christopher M. Magana's division for a criminal jury trial. McDaniel was not in the initial group of 24 jurors seated in the jury box for questioning but instead was seated in the last row of the courtroom gallery with a group of excess jurors available in the event the initial group depleted due to excused or dismissed jurors. Judge Magana released the jury panel on Monday afternoon at 4:40 and advised them to return at 8:45 the next morning to resume jury selection.

McDaniel contacted the district court around 8:30 the next morning, Tuesday, December 8, 2015, to advise the jury clerk that she was unable to obtain child care for her young son and would not be able to report for jury duty until she dropped her child off at the afternoon pre-kindergarten class in which he was enrolled. McDaniel advised the jury clerk that, alternatively, she could bring her young son in with her to the courthouse until his afternoon class started. The jury clerk told McDaniel that she needed to report to jury duty in the morning but could not bring her son when doing so. In response, McDaniel reiterated she could only report in the morning if she could bring her young son since she could not leave him at home alone. Without addressing McDaniel's dilemma, the jury clerk insisted that McDaniel was required to report in the morning but could not bring her son. As McDaniel continued to restate her dilemma and the jury clerk continued to restate the court's position, it appears the line of communication between the two individuals eventually deteriorated and the jury clerk ultimately claimed McDaniel was "extremely rude and yelling." Although there was no transcript of the phone call, McDaniel said she asked the jury clerk at some point whether the court was going to put her in jail based on her inability to obtain daycare for her son that morning. McDaniel also said she asked to speak to a supervisor but instead of granting the request, the jury clerk responded that the

jury clerk would speak with the supervisor and get back to McDaniel, which apparently never happened.

McDaniel reported to the jury clerk at approximately 2:15 p.m., after dropping her child off at his afternoon pre-kindergarten class. The jury clerk left to inform Judge Magana that McDaniel had arrived. Upon return, the jury clerk informed McDaniel to appear at a hearing scheduled for Friday, December 18, 2015, at 3 p.m. to explain to the court why McDaniel failed to report to jury duty that morning in a timely manner. Although Judge Magana later told McDaniel that he instructed the jury clerk to advise McDaniel that the hearing was one for direct criminal contempt, McDaniel argues in her brief that she was told only that she should be prepared to explain to Judge Magana why she was tardy in reporting to jury duty on Tuesday, December 8, 2015.

McDaniel appeared as directed on December 18, 2015, ready to explain her child care dilemma. For purposes of context, we have provided a copy of the transcript from this hearing below.

> "THE COURT:  We're on the record in the matter of Terra McDaniel with regard to a proceeding for direct criminal contempt.
> "Ma'am, you are Miss McDaniel, is that correct?
> "MS. MCDANIEL:  Yes.
> "THE COURT:  And you were given notice to appear today both in person by the jury clerk for today's hearing and through at least two letters that were mailed to you, correct?
> "MS. MCDANIEL:  Yes.
> "THE COURT:  And you are aware of what the proceeding is about today?
> "MS. MCDANIEL:  Yes.
> "THE COURT:  You have been directed to appear today to determine whether you are in direct contempt of court for failing to follow the court's order when you appeared last week for jury duty.

5

"For the record, Miss McDaniel was summoned to jury duty and appeared on Monday, December 7th, 2015, on a jury panel in the matter of State versus Dung Tran, 15 CR 1399. Miss McDaniel was one of a jury panel in excess of 30 people that was brought up in the afternoon on December 7th for jury selection or voir dire. And following jury selection for that day the jury panel was released at 4:40 p.m. on December 7th and the entire jury panel was advised to return back at 8:45 the following morning to continue with jury selection which was an order of the court.

"On the morning of December 8th, 2015, the court was contacted approximately 8:30 a.m. give or take by the jury clerk's office who advised that jury panelist Terra McDaniel had called in that morning to indicate she was not returning to jury service that day. And in the course of her conversation with the jury clerk she yelled at the jury clerk over the phone repeatedly and was asked on at least two occasions to stop yelling, but would not. And stated that she did not have day care and couldn't come in and that she was refusing to come in and stated, 'What were we going to do? Put her in jail?'

"At that time I noted the information from the jury clerk and proceeded with our jury selection after obtaining additional jury panelists from the jury room to fill out our panel at that time.

"For the record, Miss McDaniel was in the group of jurors that had not been seated for questioning with the initial 24 jurors that we were examining. She was in a group of approximately six to eight jury panelists in the last row of our gallery in the courtroom that we were using to replace jury panelists who were either excused or dismissed during the course of jury selection.

"The court was later advised on December 8th that Miss McDaniel had appeared at approximately 2:15 that day in the jury clerk's office seeking her certificate to be signed by the jury clerk indicating to her employer that she had, in fact, been at jury service and at that time the jury clerk advised me of Miss McDaniel's appearance and I directed them to tell her to appear for the contempt hearing today on December 18th at 3 p.m.

"Miss McDaniel, today you are here for determination of whether or not you were in direct contempt of court for failing to follow my order on December 7th to return the next day.

"Do you wish do make any statement with regard to that accusation of contempt at this time?

"MS. MCDANIEL: That was partial lies and partial truth.

6

"THE COURT:  What are you talking about?

"MS. MCDANIEL:  I asked to speak to a supervisor after I spoke with the jury clerk. I explained to her that I did not have day care. That I could come in after I dropped my son off to Pre-K in the afternoon. Otherwise, I would have to bring him.

"She said, 'No, you cannot bring your son.' I asked for a supervisor. She continued to talk. I told her, 'If I don't have day care then what do I do? You guys put me in jail for not having day care for kids? I can't leave him alone by himself.'

"She continued to say, 'Well, you can't bring your son.' So that's when I asked to speak to a supervisor. She would speak with her supervisor and she would speak with me and they would get back with me. They never got back with me.

"So after I dropped my son off I came up here to see if I could continue like I had asked earlier with the jury selection. That's when she said she could fill out the card for me. I did need it for the 7th. Then she—my mom asked her if she could come up here and ask where I go from here because she didn't have an answer at that time. She just gave me my card. I was going to leave with just that. I didn't have an answer for anything.

"And so that question got brought up if we could see what your decision was. That's when she came up here. Came down and told me that I was in contempt of court.

"To my knowledge there was another juror that was also late. That same person said I was yelling at her and that she was passed through. She could come up here. So, I came late, too, because I didn't have a child—I could have brought him. I said I'm a single parent.

"THE COURT:  Do you consider 2:15 in the afternoon to be late when you were told to be here at 8:45?

"MS. MCDANIEL:  Yes, it's late.

"THE COURT:  Anything further, Miss McDaniel?

"MS. MCDANIEL:  No.

"THE COURT:  I will also note for the record, Miss McDaniel, that I have your juror questionnaire card in front of me that was provided along with the group of the other jury panelists on December 7th. And you stated on the line if you believe you should be excluded please state your reason. 'I am a single parent of two. I also work full-time and help take care of my uncle before I go to work on my lunch break and after work.' At the bottom you wrote, 'The judicial system is against my religious beliefs. I feel I am really the wrong candidate to be a juror.'

7

"Miss McDaniel, I will advise you that of the jury panel that we had that day there were a great many of them who had scheduling issues and problems with being present for jury service. Those were relayed to us both through their juror cards and statements they had put on them and also through responses to questions and statements during their questioning by the attorneys.

"I will tell you that a number of them were the sole providers of income for their families. There were several that were self-employed and who indicated by their presence for jury service they were not making any income that day and it was a hardship for them to be present for jury service, much less to serve on a jury.

"There were a number that had various medical issues, including an individual who had significant incontinence issues that made sitting for jury selection even difficult.

"Individuals with hip issues, back issues. Some who indicated they were single parents and serving would be problematic. And finally an individual who he had a doctor's appointment that they had taken two months to obtain. And if they appeared for jury service the next day, December 8th, they would have to miss that doctor appointment.

"Miss McDaniel, all of those individuals with the exception of you showed up at 8:45 on December 8th. All of them, despite the inconvenience to both those individuals and everyone else on the panel, returned pursuant to my court order and made themselves available for jury recollection.

"Explain to me why you should be allowed to get a pass for that behavior when you refused to come in and all of those other individuals did come in?

"MS. MCDANIEL:  I was willing to bring my son with me. I don't have anybody else. It's just me. My dad is sick. My mom was my plan. Monday night my dad went to third shift he went on emergency FMLS. My mom says I have to take your dad to the hospital. I can't watch your son. That's why I called can I bring him because that's my only option. My mom is all I have. I don't have a dad. I don't have anybody else.

"THE COURT:  I expect that there were numerous problems caused to those individuals by having to come in the next day, too, similar to the ones you have just described and they did not contact our jury clerk and yell at the personnel and refused to come in.

"Miss McDaniel, it's my understanding you are no stranger to the court system, is that correct?

"MS. MCDANIEL:  No, sir.

8

"THE COURT: It would appear from reviewing the court records that you have both filed and had filed against you a protection from abuse order, is that correct?

"MS. MCDANIEL: Correct.

"THE COURT: And it's my understanding you have recently or still have proceeding against you in municipal court some sort of domestic violence matter, is that correct?

"MS. MCDANIEL: No, sir.

"THE COURT: And what's the status of that?

"MS. MCDANIEL: To my knowledge I don't have any.

"THE COURT: You don't have any what?

"MS. MCDANIEL: To my knowledge there's no opening on anything.

"THE COURT: Were you arrested for that?

"MS. MCDANIEL: Arrested for what?

"THE COURT: Some sort of—

"MS. MCDANIEL: I've been arrested twice for DV. Yes. Over six years ago. Over six years ago, I believe.

"THE COURT: And what is your employment situation right now?

"MS. MCDANIEL: I am a CNA. After this happened I put in my two weeks. I was hoping you guys could give me another chance to be on jury duty, but it will be less hectic. I will have one job. Hopefully, I can come up with somebody to watch my son.

"First off, they had told me I could just come in.

"THE COURT: I just wanted to know what your employment situation is.

"MS. MCDANIEL: I put my two weeks in that week so this is my last day.

"THE COURT: So you do not have employment?

"MS. MCDANIEL: I have my first shift job. I work with my uncle in the morning. I'm letting my second shift job go as of today.

"THE COURT: You work for your uncle doing what?

"MS. MCDANIEL: HHA.

"THE COURT: What is that?

"THE COURT: Home Health Aide. Home health care.

"THE COURT: And you say you gave your two weeks' notice at your CNA job for what reason?

"MS. MCDANIEL: Because it's hectic. My life is jammed. I don't have any openings so something like this happened.

"THE COURT:  Something like what?

"MS. MCDANIEL:  Like jury duty. Something pops up out of nowhere.

"THE COURT:  You are telling me you have quit your certified nursing assistant job so you can be available for the possibility of jury service popping up? Something like that, is that what you are saying?

"MS. MCDANIEL:  Yes. Yes, sir.

"THE COURT:  Miss McDaniel, I am finding you in violation of direct contempt. That is direct criminal contempt of court for failing to follow my order to return on December 8th.

"I do not find your explanation to be satisfactory to the point that it excuses your conduct. You chose to disregard and ignore that court order. That was not an option and the fact that that particular jury panel had so many individuals with conflicts and problems and concerns with serving on a potential jury, but they still made the successful effort to appear as directed on December 8th. And the fact that despite your version of events what I was related by the jury clerk, Miss Karen Spencer and her staff, is not the apparent mild discussion you indicated took place between you, but they indicated you were extremely rude and yelling during that conversation.

"Those two facts:  That being the jurors who did return and your behavior in the aftermath of disregarding my court order highlight your conduct as not only contemptuous, but also inconsiderate of those involved in that case.

"That conduct cannot go without consequences. As such, under K.S.A. 20-1203 for direct criminal contempt of court I'm imposing a six month controlling jail sentence. I am ordering that you serve 30 days in jail beginning today. I am authorizing work release on that sentence.

"MS. MCDANIEL:  My kids are in school. I will lose them. I'm going to lose my kids. Your Honor—

"THE COURT:  Yes, Miss McDaniel.

"MS. MCDANIEL:  Can I please—I was supposed to return back to work. This is my last—

"THE COURT:  I made my ruling, Miss McDaniel. You will need to wait here in the courtroom until a deputy arrives. If you fail to serve the 30 days or return to work release as directed during that 30 day imposed sentence then you will be subject to the full six months in jail which is your controlling sentence.

"We are in recess."

10

Although we cannot determine from the transcript what time the hearing ended, we do know that McDaniel was transported from the courtroom to the jail at some point in the late afternoon on Friday, December 18, 2015. At 4:41 that afternoon, a journal entry memorializing the contempt proceedings was filed and docketed in the case of "*In re Terra L. McDaniel*, B/F; D.O.B: XX/XX/1988," case number 15 MR 1061. The journal entry was filed in the Criminal Department of the Eighteenth Judicial District, Sedgwick County, Kansas, and stated as follows:

"**JOURNAL ENTRY OF JUDGMENT RE DIRECT CRIMINAL CONTEMPT**

"**NOW ON THIS** 18th day of December, 2015, thc Court finds the above named person (hereafter TLM) in direct criminal contempt of court pursuant to K.S.A. 20-1202 and 20-1203, based on TLM's statements to the court during the sitting of the court.

"Pursuant to K.S.A. 20-1203, the court incorporates by reference herein the extensive record made on this day which:

"1. specifies '. . . the conduct constituting such contempt. . . .'; and

"2. contains '. . . a statement of whatever defense or extenuation [CAJ] [*sic*] offered . . . .'

"The court sentenced TLM to six (6) months controlling sentence in the county jail and imposed 30 days in jail forthwith with work release authorized.

"All proceedings involving this contempt hearing were on-the-record in open court.

"**IT IS SO ORDERED.**

"CHRISTOPHER MAGANA, JUDGE"

The facts we have recited so far were obtained from the record in this matter, which consists of only 26 pages—17 of which are the transcript and journal entry of judgment set forth above. Out of the remaining nine pages in the record, only one is substantive and that is the journal entry dated December 23, 2015, which commuted McDaniel's 6-month jail sentence imposed to time served. The following facts, which

11

summarize attempts made by counsel to help McDaniel, were obtained from the appellate brief filed by McDaniel's attorney. These facts are not dispositive of whether there is sufficient evidence to support McDaniel's conviction for direct criminal contempt. Instead, these facts fill in the bits and pieces of information necessary that may be helpful in providing some level of context for the criminal contempt proceedings.

On Monday, December 21, 2015, the first business day after McDaniel was jailed, McDaniel's mother contacted attorney Jess Hoeme by telephone to represent her daughter. At this point, McDaniel already had spent 3 days in the Sedgwick County Jail. Hoeme was out of town for another hearing on Monday, so he attempted to review the district court's docket information online. Hoeme, however, was unable to find any information about McDaniel or the case in the electronic case system. Hoeme contacted the jail, and a jail employee advised Hoeme that the case had an "MR" designation. Hoeme followed up with a call to the Sedgwick County District Court clerk's office. A court clerk advised Hoeme that "MR" stood for "miscellaneous record" and meant the case file was sealed by the court and not open for examination. The court clerk further advised that because the case about which Hoeme was inquiring was designated as an "MR" case by Judge Magana, the only judge who could enter an order permitting review of the case file was Judge Magana.

Because Hoeme was out of town, he asked another attorney from his law firm to meet with Judge Magana in his chambers as soon as possible to get more information about the claims being made by McDaniel's mother. The colleague did as instructed, advising Judge Magana that his firm had been retained to assist McDaniel and was requesting permission to review the sealed case file. Judge Magana denied the request. Later that day (Monday, December 21, 2015), Hoeme attempted to electronically file an entry of appearance in the matter without success, likely due to the closed nature of the proceeding.

12

At some point prior to 9 a.m. on Tuesday, December 22, 2015, Judge Magana contacted the jail staff and ordered that McDaniel be brought to his courtroom for a hearing early Tuesday morning. There was no notice of this hearing provided to McDaniel or her attorneys. At this hearing, Judge Magana commuted McDaniel's sentence to time served and released her from custody. Hoeme, who now was back in town, arrived at the courthouse at 9 a.m. on Tuesday, December 22, 2015. By the time he arrived, however, McDaniel's hearing was over, her sentence had been commuted to time served, and she had been released.

ANALYSIS

McDaniel makes several arguments on appeal in an attempt to reverse her contempt conviction. First, she argues that her conduct was not directly contemptuous because it did not occur in the presence of the district judge. McDaniel also argues that, in summarily punishing her, Judge Magana violated her due process rights in several instances, alleging she should have had the right to the representation of counsel, to confront witnesses against her, to call witnesses on her behalf, to refrain from being a witness against herself, and to exclude inadmissible character evidence. Finally, McDaniel argues that even if she was properly convicted of direct contempt, Judge Magana failed to properly journalize the entry of judgment.

*Jurisdiction*

As an initial matter, the State argues this court lacks jurisdiction to hear McDaniel's appeal because the case was dismissed by the district court for lack of prosecution and McDaniel failed to properly reinstate it. The existence of appellate jurisdiction is a question of law over which appellate courts exercise unlimited review. *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014).

13

McDaniel was convicted on December 18, 2015, and timely filed her notice of appeal on December 30, 2015. McDaniel failed, however, to timely docket her appeal under Supreme Court Rule 2.04 (2017 Kan. S. Ct. R. 15) and failed to request an extension of time to do so before the deadline expired. As a result, the district court dismissed the appeal on March 30, 2016, pursuant to Supreme Court Rule 5.051 (2017 Kan. S. Ct. R. 32). On April 13, 2016, McDaniel filed a motion to docket out of time which this court granted.

After McDaniel filed her appellate brief in this case, the State filed a motion in the Court of Appeals to dismiss the appeal. The State argued that after an appeal is dismissed, the proper procedural vehicle to revive the appeal is a motion for reinstatement under Rule 5.051(b), not a motion to docket out of time like the one filed by McDaniel in this case. Because McDaniel failed to file the proper motion to reinstate the appeal, the State argues we have no jurisdiction to consider it.

Hoeme responded to the State's motion, acknowledging that he did not strictly comply with Rule 5.051(b). Hoeme contended that good cause existed for denying the State's motion because dismissing the appeal would create a manifest injustice for McDaniel, who was not at fault for the failure to timely docket the case. The Court of Appeals motions panel ordered Hoeme to file a written response indicating whether counsel had actual knowledge of the district court's dismissal of the case prior to docketing and why this court should not consider the appeal dismissed. Hoeme filed the written response as directed, detailing his process to docket the appeal and again emphasizing that the mistake was counsel's, not McDaniel's.

The motions panel denied the State's motion for dismissal, stating: "Although it is clear that Appellant's attorney did not follow the proper procedure for reinstating an appeal that has been dismissed by the district court, it appears that Appellant herself had no knowledge of the attorney's failure to do so." The panel also stated that the appellate

14

court's rules governing procedure and time limits are not jurisdictional, citing *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 151, 955 P.2d 1169 (1998).

The State claims the motions panel was in error and asks us to reverse that decision. In support of its claim, the State reiterates the argument it made to the motions panel: McDaniel's failure to file a motion to docket appeal out of time within 30 days as set forth in Rule 5.051(b) deprives our court of jurisdiction to hear McDaniel's appeal. We are not persuaded by the State's argument. Pursuant to K.S.A. 2016 Supp. 22-3608(c), McDaniel had 14 days after the judgment of the district court to file her direct appeal. While McDaniel filed her notice of appeal within 14 days as required, she failed to properly docket it with this court. Under Rule 5.051(a) (2017 Kan. S. Ct. R. 32-33), when "an appellant has filed a notice of appeal in the district court, but has failed to docket [it] in compliance with Rule 2.04, the appeal is presumed abandoned and the district court may enter an order dismissing the appeal." The order of dismissal is final unless the appellant submits an application for reinstatement for good cause shown to the clerk of the appellate courts within 30 days. Rule 5.051(b). McDaniel failed to request reinstatement within the 30-day time period as required by Rule 5.051(b).

While the timely filing of a notice of appeal is jurisdictional based on the statutory deadline, "most of the subsequent steps in prosecuting an appeal are generally provided by appellate rule and are enforceable as this court deems appropriate in its discretion." *Fowler v. State*, 37 Kan. App. 2d 477, 480-81, 154 P.3d 550 (2007); see *Adams*, 264 Kan. at 151. Thus, an appellant's failure to take the proper steps to secure appellate review does not affect this court's jurisdiction to entertain the appeal so long as the initial notice of appeal was timely filed as required by K.S.A. 2016 Supp. 22-3608(c), which McDaniel did here. 37 Kan. App. 2d at 480-81. Given the facts presented in this particular case, we find jurisdiction is proper and move on to address the merits of McDaniel's appeal.

*Direct contempt*

McDaniel argues Judge Magana erred in finding her in direct contempt for being tardy on the second day of jury duty because her conduct (tardiness) occurred outside the presence of the court. On appeal from a finding of contempt, this court applies a dual standard of review: we exercise unlimited review over the question of whether conduct is contemptuous and apply an abuse of discretion standard when reviewing the sanctions imposed. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002).

In Kansas, there are two classes of contempt: direct contempt and indirect contempt. K.S.A. 20-1201. Pursuant to K.S.A. 20-1202, conduct is classified as direct contempt when the underlying contemptuous acts are committed in open court in the presence of the judge "where all of the essential elements of the misconduct are under the eye of the court [and] are actually observed by the court." *In re Oliver*, 333 U.S. 257, 275, 68 S. Ct. 499, 92 L. Ed. 682 (1948). The accused is entitled to fewer statutory and constitutional procedural safeguards in direct contempt proceedings because the court has personal knowledge of the misconduct. Specifically, the district court may impose summary punishment without written accusation as long as the court enters a written judgment that specifies the conduct constituting direct contempt, identifies the statement of the defense offered by the accused, and designates the sentence imposed. K.S.A. 20-1203; 333 U.S. at 275.

If the judge needs to rely on statements and testimony from others regarding what they know about the contemptuous acts, however, the misconduct is no longer direct contempt but instead is indirect contempt. 333 U.S. at 275-76. The accused is entitled to greater constitutional procedural safeguards in proceedings for indirect contempt because the judge has no personal knowledge of the misconduct. "[K]nowledge acquired from the testimony of others, or even from the confession of the accused, would not justify conviction" unless the accused was provided with a trial and an opportunity to defend

16

against the charges. 333 U.S. at 275. By statute, Kansas provides a detailed procedure that must be followed in cases of indirect contempt. In particular, the district court on its own motion must file an order to appear and show cause, and this motion must be accompanied by an affidavit specifically setting forth facts supporting the allegation of contempt. K.S.A. 2016 Supp. 20-1204a(a), (d). Thus, unless the contempt is "committed in open court," the law requires that "one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation." *In re Oliver*, 333 U.S. at 274-75; see K.S.A. 20-1201 *et seq*.

In support of her claim that the contemptible conduct in this case did not constitute direct contempt, McDaniel relies on *State v. Williams*, 28 Kan. App. 2d 97, 100-01, 11 P.3d 1187 (2000). In *Williams*, a panel of this court held that a prospective juror's conduct was not subject to summary sanction as direct criminal contempt where that conduct was not directly observed by the district judge and court proceedings were not significantly disrupted. In that case, Riggs was a prospective juror. During voir dire, the judge asked the panel of prospective jurors to stand, raise their right hands, and be affirmed or take the oath to serve as jurors in the courtroom. Riggs did not stand; it is unclear whether she took her oath sitting down. The district judge found her to be in contempt of court for failing to take the oath as instructed, set a sentencing date, and asked if Riggs wanted an attorney. 28 Kan. App. 2d at 98. At the hearing, Riggs' counsel explained that Riggs was not feeling well at voir dire because she had not taken her medication for her carpal tunnel syndrome. Riggs and her attorney both stated that Riggs did not intend to act in a disrespectful manner. The court nevertheless found Riggs in contempt, fined her $200, sentenced her to a controlling jail term of 30 days, and placed her on nonreporting probation. 28 Kan. App. 2d at 98-99. Riggs appealed, arguing in part that her conduct was not contemptuous. 28 Kan. App. 2d at 100.

17

On review, this court agreed that Riggs' conduct was not subject to summary sanction as a direct contempt. The panel noted that the district judge stated on the record during voir dire that he did not directly observe Riggs' conduct, and he relied on after-the-fact conversations with other jurors to determine that the conduct was contemptuous. The *Williams* court also found the conduct at issue did not constitute criminal contempt because "Riggs caused no significant disruption in the trial; voir dire was able to proceed to completion as soon as the judge told her to take a different seat." 28 Kan. App. 2d at 100-01. As opposed to civil contempt, conduct giving rise to sanctions for criminal contempt is "'directed against the dignity and authority of a court or a judge acting judicially, with punitive judgment to be imposed in vindication; its essence is that the conduct obstructs or tends to obstruct the administration of justice.'" *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 (1997). Criminal contempt punishes a party for a past violation of an order with a fixed fine or jail sentence as a punitive sanction. See *In re Marriage of Shelhamer*, 50 Kan. App. 2d 152, 155-56, 323 P.3d 184 (2014) (discussing direct and indirect contempt and civil and criminal remedies).

Civil contempt, on the other hand, is a remedial or corrective action meant to coerce a party into abiding by the terms of a court order going forward. Upon a finding of civil contempt, a court may jail a particularly recalcitrant party for an indefinite period until he or she agrees to comply with the order. The court may impose a periodic fine— daily or weekly, for example—or some other coercive sanction until the party complies. 50 Kan. App. 2d at 155-56. The party in civil contempt must be permitted to "unlock the door of the jail" by doing what the party previously failed to do. *In re J.T.R.*, 47 Kan. App. 2d 91, Syl. ¶ 6, 271 P.3d 1262 (2012).

Like the district judge in *Williams*, Judge Magana stated during the contempt hearing that he learned about McDaniel's tardiness in appearing for jury duty from the jury clerk; McDaniel did not interact with Judge Magana at all on Tuesday, December 8, 2015, the day of the alleged contemptuous conduct. And there is no evidence McDaniel

18

caused an interruption in the court proceedings by arriving late for the second day of jury duty. Thus, although labeled as such by the district court, it appears McDaniel's conduct does not qualify as direct contempt or criminal contempt.

But the State contends that the analysis in *Williams* is inapplicable given that Kansas Supreme Court precedent construed the failure to appear in court as a direct contempt under *Jenkins*, 263 Kan. 351. In *Jenkins*, an attorney failed to appear at his client's preliminary hearing and was late for the rescheduled hearing later that day. The district judge filed an order imposing contempt sanctions, and the attorney appealed. 263 Kan. at 352-53. In analyzing an attorney's conduct as contemptuous, the Kansas Supreme Court adopted a "hybrid contempt approach," under which the characterization of an attorney's failure to appear as direct or indirect is deferred until after the contemnor has an opportunity to explain his or her actions leading to the contempt charge. If the contemnor provides an adequate explanation for his or her absence, then the inquiry ends. But, if the contemnor refuses to explain his conduct or provides an insulting or inadequate explanation, the district court may treat the offense as direct contempt because both the conduct leading to the charge and the inadequate explanation occurred in the presence of the court. 263 Kan. at 363. The Supreme Court upheld the attorney's direct contempt conviction in *Jenkins* because the unsatisfactory explanation for the absence was in the court's presence and that the attorney's absence caused a loss of valuable time to the court, the parties, other attorneys, and the witnesses who had to wait several hours for the attorney to appear for the hearing. 263 Kan. at 358, 363-64.

The State argues that under *Jenkins*' hybrid contempt approach, both McDaniel's absence from jury duty and her unsatisfactory explanation occurred in the presence of the court. We are not persuaded by the State's argument. First, and definitively distinct from the facts in *Jenkins*, McDaniel was not an attorney or a witness in the proceedings before the court but instead a prospective juror in an excess pool of panelists. The failure of a prospective juror to appear for jury duty is governed by K.S.A. 43-165, which states that

19

each judicial district may make rules governing jury service and enforcement, but "[u]nexcused, nonattendance of a person summoned unless reasonable cause for such nonattendance be shown to the satisfaction of the court shall be punished by the imposition of a fine not exceeding one hundred dollars ($100) for each day of unexcused absence." As a matter of public policy, then, the legislature has provided a punitive statutory alternative to criminal contempt proceedings when a person is summoned for jury duty and the court ultimately finds that a failure to appear was without reasonable cause. This is the exact breach of the law for which the court found McDaniel guilty, so the district court could not impose other sanctions.

Moreover, and again definitely distinct from the facts in *Jenkins*, there is no evidence that McDaniel's late arrival as a prospective juror in an excess pool of panelists obstructed or tended to obstruct the administration of justice. *Jenkins*, 263 Kan. at 358. In fact, Judge Magana stated that after he was informed by the jury clerk that McDaniel did not appear at 8:45 a.m. on Tuesday, December 8, he "noted the information from the jury clerk and proceeded with our jury selection after obtaining additional jury panelists from the jury room to fill out our panel at that time." In other words, jury selection was able to proceed without interruption to the court's proceedings.

For all of the reasons stated above, we find McDaniel's failure to appear the morning of her second day of jury duty did not constitute a direct criminal contempt but instead indirect criminal contempt, if contempt at all. As explained above, the accused is entitled to greater constitutional procedural safeguards in proceedings for indirect contempt because the judge has no personal knowledge of the misconduct. Those safeguards are entrenched in accepted principles of constitutional due process and are codified in K.S.A. 2016 Supp. 20-1204a(a). In Kansas, the court must file an order to appear and show cause why a judgment of indirect contempt should not be entered. The court must file an affidavit with this order that specifically sets forth the facts supporting the allegation of indirect contempt. K.S.A. 2016 Supp. 20-1204a(a), (d). The accused

20

must have a reasonable opportunity to meet the charges of indirect contempt by way of defense or explanation, which includes the right to be represented by counsel, the right to testify, and the right to call and cross-examine witnesses. *In re Oliver*, 333 U.S. at 274-75.

Applied here, McDaniel was deprived, at a minimum, of the following rights: (1) the right to be fully informed of the charges against her, including the nature and scope of punishment she was facing if found guilty; (2) the right to confront the jury clerk, whose statements were used against her; (3) the right to call witnesses on her behalf; (4) the right to refrain from being a witness against herself; (5) the right to the protection of the rules of evidence, for example by excluding inadmissible character evidence; and (6) the right to have counsel to represent her at the contempt hearing and commutation of sentence hearing.

Judge Magana erred in deeming McDaniel's morning absence from jury duty as direct criminal contempt and by summarily punishing McDaniel, the result of which deprived her of the procedural due process rights to which she was entitled in order to defend against the charge of direct criminal contempt lodged against her.

*Journal entry*

Even if Judge Magana's decision to file a charge of direct criminal contempt against McDaniel was proper, we necessarily find the conviction void based on Judge Magana's failure to comply with the strict requirements set forth in K.S.A. 20-1203 in journalizing the judgment of direct contempt:

> "That a direct contempt may be punished summarily, without written accusation
> against the person arraigned, but if the court or judge in chambers shall adjudge him
> guilty thereof a judgment shall be entered of record, in which shall be specified the

21

conduct constituting such contempt, with a statement of whatever defense or extenuation the accused offered thereto, and the sentence of the court thereon."

K.S.A. 20-1203 is jurisdictional. *Harsch v. Miller*, 288 Kan. 280, 295, 200 P.3d 467 (2009). Whether jurisdiction exists is a question of law over which this court's review is de novo. *Williams*, 28 Kan. App. 2d at 100. Direct contempt orders that do not specify the conduct constituting the contempt or state the defense offered by the accused are void. *Harsch*, 288 Kan. at 295; *In re Gambrell*, 160 Kan. 620, 623, 164 P.2d 122 (1945).

Here, the journal entry did not comply with K.S.A. 20-1203. The district court stated:

"Pursuant to K.S.A. 20-1203, the court incorporates by reference herein the extensive record made on this day which:
"1. specifies '. . . the conduct constituting such contempt. . . .'; and
"2. contains '. . . a statement of whatever defense or extenuation [CAJ] [*sic*] offered. . . .'"

The resolution of this issue requires this court to construe language of the statute. Statutory interpretation involves a question of law over which appellate review is unlimited. *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005). Ordinary words are to be given their ordinary meanings and technical words their technical meaning. When a statute is plain and unambiguous, an appellate court must give effect to the legislature's intent as expressed rather than determining what the law should or should not be. *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

There is no authoritative case directly addressing a journal entry that does not include the statements of conduct and defense directly as required by the plain language of the statute but rather incorporates a hearing transcript in full by reference. However, direct contempt orders have been held to a strict standard and deemed void for either failure to specify the conduct constituting contempt or failure to state any defense or

extenuation offered by the accused. See, *e.g.*, *Williams*, 28 Kan. App. 2d at 102 (journal entry did not include statement of defenses Riggs relied upon and "[t]he fact that we have access to a transcript of Riggs' sentencing hearing does not excuse the district court's obligations under K.S.A. 20-1203"); *State v. Flanagan*, 19 Kan. App. 2d 528, 533, 873 P.2d 195 (1994) (perfunctory journal entry did not specify grounds or set forth any defense offered).

First, the statute requires the district court to "specify" the conduct that constitutes contempt and to make a "statement" of any defense offered. In the Webster New Collegiate Dictionary, "specify" means "to name or state explicitly or in detail." Webster New Collegiate Dictionary 1116 (1973). Additionally, the relevant definition of "statement" is "a report of facts or opinions." Webster New Collegiate Dictionary 1136 (1973). A general reference to the hearing transcript without more does not meet statutory direction to state explicitly or in detail the conduct constituting the offense or to report the facts of the contemnor's defense. Moreover, the journal entry at issue states that CAJ offered a statement of defenses at the hearing—there is no explanation regarding who CAJ refers to, but it is not a reference to McDaniel (who was referred to as TLM in the journal entry). Thus, even with this reference to the hearing transcript, the journal entry does not purport to offer a statement of McDaniel's defense. The journal entry does not meet the requirements as set out in K.S.A. 20-1203 and, therefore, is void.

McDaniel's contempt conviction is reversed and the district court is directed to vacate that conviction. Reversed and remanded.